**NIGHTLIFE PARTNERS, LTD.; et al., Plaintiffs,**

v.

**CITY OF BEVERLY HILLS, Defendant.**

**No. CV01–01563 DDP (SHx).**

United States District Court, C.D. California.

Feb. 11, 2004.

---

Roger Jon Diamond, Roger J. Diamond Law Offices, Santa Monica, CA, Bradley J. Shafer, Shafer & Associates, Lansing, MI, for plaintiffs.

Mitchell E. Abbott, Terence Rex Boga, Laurence S. Wiener, Patrick K. Bobko, Richards, Watson & Gershon, Los Angeles, CA, for defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the defendant City of Beverly Hills' motion for summary judgment, which was filed on November 20, 2003. After reviewing the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the motion and adopts the following order.

## I. Background

### A. *Factual History* [1]

The plaintiffs in this action are Nightlife Partners, Ltd. ("Nightlife"), Entertain-

---

1. The factual history section is adopted from the Court's June 19, 2002 Order in which the Court granted and denied portions of both the defendant's and the plaintiffs' motions for summary judgment. Unless noted, all cita-

ment Associates of L.A., Inc. ("Associates"), Deja Vu Showgirls of Beverly Hills, L.L.C. ("Showgirls"), and Deja Vu Consulting, Inc. ("Deja Vu") (collectively hereinafter the "business plaintiffs"). The business plaintiffs are either the owners or operators of an establishment known as The Beverly Club (the "Club"),[2] located in the basement of a one-story building at 424 North Beverly Drive, in the City of Beverly Hills, California. The plaintiffs Jane Doe I and Jane Doe II are professional dance entertainers who have either performed at the Club in the past, or desire to perform at the Club in the future.

In 1998, the Club began operating on the premises as a nightclub and/or adult cabaret. When it opened, the Club featured female dancers who performed topless. (Pls' Mot. at 1.) Subsequently, the Club switched to presenting live dance entertainment it characterizes as "bikini dancing." (*Id.* at 4.)

On July 2, 1998, after the Club was already open, the defendant City of Beverly Hills (the "City") enacted an adult entertainment regulatory ordinance, Ordinance No. 98–0–2302 (the "Ordinance"), known as "Chapter 7," which amended the Beverly Hills Municipal Code ("B.H.M.C."). As originally enacted, the Ordinance defined businesses as "adult cabarets" or "adult theaters" that presented, as a regular and substantial course of conduct, live performances that are charac-

terized by an emphasis upon specified sexual activities or the exposure of specified anatomical areas. B.H.M.C. §§ 4–7.102(a)(3) & (5).

After the passage of Chapter 7, the Club attempted to exempt itself from regulation under the Ordinance by changing formats and presenting exclusively "bikini dancing."[3]

In 1999, as part of amendments to the Ordinance adopted pursuant to Ordinance No. 99–0–2337, effective November 19, 1999, the terms "adult cabaret" and "adult theater" were amended to include (and regulate) entertainment facilities that presented "any semi-nude person." B.H.M.C. §§ 4–7.102(a)(3) & (5) (Pls' Mot. Ex. B at 45). In addition, the 1999 amendments prohibited, for the first time, performances in which entertainers exposed "specified anatomical areas." B.H.M.C. § 4–7.207(1).[4]

On November 8, 2001, the City enacted Ordinance No. 01–0–2386, which amended Chapter 7 to define semi-nude as: "a state of dress in which clothing covers no more than the genitals, pubic region, buttock, areola and nipple of the female breast, as well as portions of the body covered by supporting straps or devices. Examples of 'semi-nude' include, without limitation, a state of dress consisting of a bikini outfit or equivalent clothing." B.H.M.C. § 4–7.102(m).

tions in this section refer to the moving papers associated with those motions.

**2.** Since the Court's June 19, 2002 Order, the sign on the exterior of the building has been changed to "Larry Flynt's Hustler Club." (Schwab Decl., ¶ 8.) Despite this name change, the Court will continue to refer to the establishment as the "Club" or the "Beverly Club."

**3.** According to the plaintiffs, "[i]n an effort to relieve the club and the entertainers who perform therein from the draconian provisions of

an 'adult' business licensing and regulatory ordinance enacted after the Beverly Club opened, the facility began presenting exclusively 'bikini' dancing, where all entertainers had their breasts, buttocks, and genital areas fully covered." (Pls' Mot. at 1.)

**4.** Section 4–7.207(1) provided that: "No owner or other person with managerial control over the adult entertainment business shall permit any person on the premises to engage in a live performance characterized by the exposure of specified anatomical areas." *Id.*

## B. *Procedural History*

On April 8, 2002, the parties' cross-motions for summary judgment came before the Court for oral argument. The plaintiffs also sought the following relief: (1) to enjoin certain challenged provisions of the B.H.M.C. as unconstitutional as applied to the plaintiffs and on their face; and (2) to enjoin the City from enforcing the conditional use permit previously issued for the premises now occupied by the Beverly Club. Immediately prior to the April 8, 2002 hearing, the Court distributed a tentative ruling to the parties. At the conclusion of oral argument, the Court invited the parties to submit limited supplemental briefing. On April 26, 2002, the City Council of Beverly Hills unanimously adopted Ordinance No. 02-0-2396, amending the City's Adult Entertainment Regulatory Ordinance. (Def's Suppl. Brief Ex. A.) These amendments were adopted in direct response to certain issues that the Court raised in its tentative ruling.

As a result of the April 26, 2002 amendments, many of the Ordinance's provisions became materially different from the provisions that existed when the plaintiffs filed their motion for summary judgment on January 28, 2002. Accordingly, in the Court's June 19, 2002 Order, the Court denied preliminary injunctive relief to the plaintiffs on the ground that the City could not be enjoined from enforcing an ordinance that no longer existed. (*See* 06/19/02 Order at 4:19–20.) Having denied injunctive relief to the plaintiffs, the Court proceeded to address only the parties' cross-motions for summary judgment. In its June 19, 2002 Order, the Court ruled as follows:

> The Court GRANTS the plaintiffs' motion for partial summary judgment on the grounds that the following portions of the Ordinance are unconstitutional: (1) the Ordinance's definition of semi-nude; and (2) the Ordinance's "no-touching" provision.

> The Court GRANTS the City's motion for summary judgment on the grounds that the following portions of the Ordinance are constitutional: (1) the Ordinance's fee provisions; (2) the permit revocation and suspension procedures; (3) the inspection provisions; and (4) the processing of applications and judicial review provisions.

> The Court finds that genuine issues of material fact exist, which preclude the Court from ruling on the constitutionality of the related provisions, with regard to the following issues: (1) whether the Ordinance's "[restricted]tipping" provisions, B.H.M.C. §§ 4–7.207(k)(5) & (6), act as an absolute bar to the plaintiffs' operation in the market; (2) whether the Ordinance's dancer-patron separation requirements, B.H.M.C. § 4–7.207(k)(1), function as an absolute bar to the market, as well as the City's enforcement practices regarding this provision; and (3) whether the personal disclosure requirements of B.H.M.C. § 4–7.302(b) inhibit adult entertainers from performing in the City.

> The plaintiff has succeeded in casting doubt on the City's rationale for: (1) amending the Ordinance in 1999 to prohibit the exposure of "specified anatomical areas" (B.H.M.C. § 2.207.7(1)); and (2) amending the definition of "semi-nude" in 2001 (B.H.M.C. § 2–207.1(m)). Pursuant to the directive of the Supreme Court in *Alameda Books*, the burden now shifts back to the City. Within fourteen days from the date of this Order, the Court orders that the City supplement the record with evidence renewing support for a theory that justifies these amendments to the Ordinance. This supplemental briefing is not to exceed fifteen (15) pages. Within fourteen days from the date that

the City submits this supplemental briefing to the Court (and serves the plaintiff with a copy), the plaintiff may submit a responsive brief of no more than fifteen pages (15). Unless the Court determines that argument is necessary, the Court will take the matter under submission and rule without oral argument.

The Court finds that principles of federalism and comity make it appropriate for this Court to abstain from considering or ruling upon the constitutionality of the prior permit renewal provision, B.H.M.C. § 4–7.214, which is the subject of a pending state court administrative mandamus proceeding.

The Court finds that the conditional use permit process of the B.H.M.C. relating to off-site parking is content-neutral, and does not unconstitutionally interfere with the plaintiffs' ability to operate their business. The Court therefore DENIES the plaintiffs' motion for summary judgment and injunctive relief on this claim.

(06/19/02 Order at 58–59.)

Pursuant to the Court's June 19, 2002 Order, on July 3, 2002 and July 23, 2002, respectively, the City and the plaintiffs submitted supplemental post-hearing memoranda. On September 5, 2002, the Court issued an Order Re: Supplemental Briefing (1) denying the plaintiffs' motion for summary judgment that the 1999 and 2001 amendments to Chapter 7 are unconstitutional, and (2) denying the plaintiffs' request to permanently enjoin enforcement of the 1999 and 2001 amendments. (See 09/05/02 Order Re: Supplemental Briefing at 8:9–12.)

On September 20, 2002, the plaintiffs filed a motion for reconsideration of the Court's Orders of June 19, 2002 and September 5, 2002. The Court issued an Order denying the plaintiffs' motion for reconsideration on October 29, 2002.

Thereafter, the plaintiffs filed an appeal from the Court's Orders. The Ninth Circuit summarily dismissed the appeal on August 19, 2003.

On November 20, 2003, the City filed the instant motion for summary judgment, seeking to terminate the litigation or, alternatively, to narrow the issues remaining to be tried.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505.

### 1. Successive Motions for Summary Judgment

"The order of denial of summary judgment is an interlocutory decree, ... and accordingly the court in its discretion may reconsider such order." *Kern–Tulare Water Dist. v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part, rev'd in part on other grounds*, 828 F.2d 514 (9th Cir.1987), *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (citations omitted). A district court

has discretion to entertain a second motion for summary judgment. *See Knox v. Southwest Airlines*, 124 F.3d 1103, 1105–06 (9th Cir.1997) (rejecting contention that successive motions for summary judgment are impermissible). "A renewed or successive summary judgment motion is appropriate especially if one of the following grounds exists: '(1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3)[the] need to correct a clear error or prevent manifest injustice.'" *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir.1995) (quoting *Kern–Tulare Water Dist.*, 634 F.Supp. at 665).

### B. Facial v. As–Applied Challenge

An as-applied challenge contends that the law is unconstitutional as applied to the plaintiff's particular speech activity, even though the law may be capable of valid application to others. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). A statute may be facially unconstitutional if: (1) it is unconstitutional in every conceivable application; or (2) it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.[5] *Id.* A facial attack against a law's constitutionality may proceed along four axes: (1) the law may impermissibly burden the plaintiff's rights; (2) it may impermissibly burden the rights of third parties; (3) it may fail to provide adequate notice of what conduct is prohibited; or (4) it may lack sufficient guidelines to prevent arbitrary and discriminatory enforcement.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495–98, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The first two axes assail the law as a prior restraint or an invalid time, place, or manner restriction. *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151–55, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The second axis additionally is an attack for overbreadth, in which the plaintiff asserts the rights of third parties. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–14, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The third and fourth axes are challenges for vagueness. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A successful challenge to the facial constitutionality of a law invalidates the law itself. *Foti*, 146 F.3d at 635.

### C. Overbreadth

A law is unconstitutionally overbroad if it "prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114, 92 S.Ct. 2294 (footnote omitted). To render a statute unconstitutional, "overbreadth must ... be 'substantial.'" *Broadrick*, 413 U.S. at 630, 93 S.Ct. 2908. It is well established that, in the area of freedom of expression, an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. *See, e.g., City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798–99, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).[6] The Su-

---

**5.** The first type of facial challenge involves a plaintiff who argues that the statute "could never be applied in a valid manner because it is unconstitutionally vague or it impermissibly restricts a protected activity." *Id.* In the second type of challenge, "the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties." *Id.* Thus, the plaintiff has standing to argue that a law is facially overbroad as it relates to the expressive activi-

ties of others, whether or not he also challenges the law's overbreadth as it relates to his own expressive activities. *See id.*

**6.** This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. *See, e.g., New York v. Ferber*, 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

preme Court has cautioned that over-breadth is "manifestly, strong medicine," *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908, and has invalidated regulations only when a limiting construction is not readily available, and the unconstitutional applications of the regulation are real and substantial in relation to the regulation's plainly legitimate sweep. *See, e.g., Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

### D. *Vagueness*

■ In a facial vagueness challenge, the ordinance need *not* be vague in all applications if it reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman*, 455 U.S. at 494–95, 102 S.Ct. 1186. A statute's vagueness exceeds constitutional limits if its "deterrent effect on legitimate expression is ... both real and substantial, and if the statute is [not] readily subject to a narrowing construction by the state courts[.]" *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (quotation marks & citation omitted). Uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes "in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 705, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).[7]

■ Federal courts have duty to construe a statute in order to save it from constitutional infirmities. *Morrison v. Olson*, 487 U.S. 654, 682, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). At the same time, a court cannot "save" an ordinance through a judicial construction, because a federal court cannot rewrite or provide a narrowing interpretation of a state regulation.

*Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

## III. Discussion

As an initial matter, the Court addresses the plaintiffs' argument that the City's instant motion for summary judgment is a "disguised motion for reconsideration" concerning the Court's June 19, 2002 Order, and that, under the circumstances here, the motion is prohibited by Local Civil Rule 7–18. Local Civil Rule 7–18 provides:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

C.D. Cal. Local Civ. R. 7–18.

As previously stated in the legal standards section, the Court has discretion to entertain a second motion for summary judgment and to reconsider its rulings as to issues on which the Court previously denied summary judgment. In the instant motion, the City raises issues that the Court has not yet considered, as well as issues that the Court has already ruled upon. In exercising its discretion to enter-

---

**7.** Vague laws are offensive because they may entrap the innocent by not giving fair warning of what conduct is prohibited. *Id.* Where First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required. *Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294.

tain this motion, the Court will address all issues under the standard applicable to a motion for summary judgment.

In the instant motion, the City moves the Court for an order finding that the City is entitled to summary judgment as to the following issues: (1) the Club is an "Adult Cabaret" as that term is used in Chapter 7; (2) Chapter 7 does not constitute an impermissible prior restraint in violation of the Supreme Court's holding in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); (3) Chapter 7's dancer registration requirements are constitutional; (4) Chapter 7's restricted tipping provisions are constitutional; (5) Chapter 7's six-foot separation requirement is constitutional; (6) the City's enforcement of Chapter 7 does not constitute a "taking" of the plaintiffs' property without just compensation in violation of the Fifth and Fourteenth Amendments; (7) Chapter 7 does not violate the plaintiffs' substantive due process rights; (8) Chapter 7's zoning, location, and conditional use permit restrictions are constitutional; (9) the plaintiffs are not entitled to damages; and (10) the plaintiffs are not entitled to recover attorney's fees under 42 U.S.C. § 1988. In their opposition brief, the plaintiffs request the Court to find that Chapter 7's previous permit renewal provision was impermissibly vague and therefore unconstitutional. The Court addresses each issue in turn.

### A. *The Club is an Adult Cabaret*

In the first and second causes of action, the plaintiffs allege that, because their dancers wear bikinis, the Club is not an "adult cabaret" and is thus not properly subject to Chapter 7's regulations. In the first cause of action, the plaintiffs seek declaratory relief that the Club is not an "adult entertainment business" under Chapter 7. In the second cause of action, the plaintiffs seek injunctive relief against enforcement of Chapter 7 against the

Club. In the Court's September 5, 2002 Order Re: Supplemental Briefing, the Court stated that "there is still a factual dispute regarding whether the Club presents 'adult' entertainment, and neither party moved for summary judgment on this issue" in the previous round of motions for summary judgment. (09/05/02 Order Re: Suppl. Briefing at 5 n.3.) The City now moves for summary judgment on this issue, and the Court grants it.

The plaintiffs concede that the Club is an "adult cabaret" as defined by Chapter 7 and appear to abandon their first and second causes of action. In their opposition brief, the plaintiffs state:

> Because of numerous amendments made to Chapter 7 as a result of this litigation, and in light of various rulings by this Court that have benefitted the Plaintiffs, the reasons for the Plaintiffs at this time to attempt to operate in a fashion where the Beverly Club would not be considered to be an "adult entertainment business" under Chapter 7 no longer apply. Accordingly, the Court need not address this issue. Of course, the Plaintiffs always have the option in the future of altering the operation of their business so that it does not fall within the scope of Chapter 7, but Plaintiffs do not desire to make that alteration at this time.

(Opp. at 16:22–27.) Chapter 7 defines "adult entertainment business" to include an "adult cabaret." B.H.M.C. 4-7.102(a)(3). "Adult cabaret" is defined as "an establishment that serves food or beverages and that, for any form of consideration, as a regular and substantial course of conduct presents live performances that are characterized by an emphasis upon specified sexual activities or feature any semi-nude person." *Id.* The Court finds that the Club is an "adult cabaret" as defined by Chapter 7. Thus, the Court grants the City's motion for summary

judgment on this issue, thereby disposing of the first and second causes of action.

### B. *Chapter 7 Does Not Constitute an Impermissible Prior Restraint in Violation of Freedman v. Maryland*

Although the Court did not expressly reserve ruling upon this issue in its prior orders, the City moves for summary judgment that Chapter 7 does not constitute an impermissible prior restraint in violation of the Supreme Court's holding in *Freedman*, 380 U.S. 51, 85 S.Ct. 734. In paragraph 80K of the complaint, the plaintiffs allege that Chapter 7 is unconstitutional because "[i]t fails to contain the mandatory *Freedman* procedural guarantees ...." (Compl.¶ 80K.)

■■ It is well established that sexually explicit but non-obscene live adult entertainment is expressive conduct protected by the First Amendment, as applied to the states through the Fourteenth Amendment. *See, e.g., Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). In *City of Erie v. Pap's A.M.*, the Supreme Court concluded that "[g]overnment restrictions on public nudity ... should be evaluated under the framework set forth in *United States v. O'Brien.*" 529 U.S. 277, 278, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). The *O'Brien* test requires that a restriction: (1) be within the constitutional power of the government to enact; (2) serve a substantial government interest; (3) not be related to the suppression of free expression; and (4) not be any greater than necessary to serve the substantial government interest. *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ A regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but it need not be the least restrictive or least intrusive means of doing so. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). For a regulation to be content-neutral, the enacting authority must be predominantly motivated by a substantial governmental interest, such as the control or reduction of deleterious secondary effects of the establishment to be regulated. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Secondary effects may include, but are not limited to, threats to public health or safety. *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir.1998).

The City contends that the Ordinance is a content-neutral regulation because it aims to prevent the harmful secondary effects that some studies have shown to be associated with adult businesses. B.H.M.C. § 4–7.101.[8] In its June 19, 2002 Order, the Court found that the Ordinance is properly analyzed as a content-neutral regulation. The Court's finding is supported by Ninth Circuit precedent. "Restrictions upon nude dancing are considered content-neutral because they are aimed at the so-called secondary effects of nude dancing and not at expressive conduct." *Clark v. City of Lakewood*, 259 F.3d 996, 1004 (9th Cir.2001) (citing *Pap's A.M.*, 529 U.S. at 289–92, 120 S.Ct. 1382).

■ A licensing scheme regulating nude, or semi-nude, dancing is considered a prior restraint because the enjoyment of

---

8. "The purpose of this Chapter is to prevent community-wide adverse secondary effects that can be brought about by the unregulated operation of adult entertainment businesses. These adverse secondary effects include, but are not limited to: depreciation of property values, increased vacancy rates in residential and commercial areas; increased criminal activity; increased litter, noise, and vandalism; and interference with the enjoyment of residential property in the vicinity of such businesses." B.H.M.C. § 4–7.101.

protected expression is contingent upon the approval of government officials. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 223–24, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity. *See id.* at 225, 110 S.Ct. 596. In *Freedman,* the Supreme Court held that three procedural safeguards were necessary for a licensing scheme to be constitutional. 380 U.S. at 58–60, 85 S.Ct. 734. Specifically, the Supreme Court determined that: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS,* 493 U.S. at 227, 110 S.Ct. 596 (citing *Freedman,* 380 U.S. at 58–60, 85 S.Ct. 734).

In the instant motion for summary judgment, the City first contends that *Freedman,* which dealt specifically with the censoring of a motion picture, does not apply to an evaluation of the constitutionality of a city ordinance regulating adult cabarets. (Mot. at 15:2–7.) The Court disagrees, as subsequent Supreme Court decisions have made it clear that the *Freedman* procedural guarantees apply to ordinances regulating various adult businesses, including adult cabarets. *See, e.g., FW/PBS,* 493 U.S. at 223, 110 S.Ct. 596.

██ The plaintiffs do not argue that Chapter 7 fails to satisfy the first two *Freedman* requirements, and the Court finds that each requirement is satisfied here. First, Chapter 7 provides that the Director of Finance "shall, within thirty (30) City business days of the filing of an application, approve and issue the adult entertainment regulatory permit if a com-

plete application has been submitted and the requirements of this Chapter have been met..." B.H.M.C. § 4–7.203. If the applicant appeals a decision of denial, the Director's decision "shall be stayed during . . . the pendency of any appeal." *Id.* § 4–7.502. Second, under California Code of Civil Procedure § 1094.8, state law provides for the expedited judicial review of any administrative mandamus petition that seeks review of the issuance, revocation, suspension, or denial of a permit for expressive conduct protected by the First Amendment. *See* Cal.Civ.Proc.Code § 1094.8. Based on the foregoing considerations, the Court finds that Chapter 7 satisfies the first two *Freedman* requirements.

The plaintiffs argue that the Ordinance fails to satisfy the third procedural safeguard articulated in *Freedman* because Chapter 7 does not require the City to go to court to suppress the speech and to bear the burden of proof once there. (Opp. at 3–12.) The City, apparently conceding that the Ordinance does not satisfy the third *Freedman* requirement, instead argues that the third *Freedman* requirement does not apply to Chapter 7. (Reply at 3–9.) For the following reasons, the Court agrees with the City and finds that the third *Freedman* requirement does not apply to Chapter 7.

In *FW/PBS,* a three-justice plurality of the Supreme Court held that only the first two *Freedman* procedural safeguards are necessary in order for adult business licensing schemes to be constitutional. 493 U.S. at 230, 110 S.Ct. 596. The *FW/PBS* plurality distinguished the censoring scheme at issue in *Freedman* from cases, such as the present case, involving adult business licensing schemes. The *FW/PBS* plurality stated that in *Freedman,* "the censor engaged in direct censorship of particular expressive material," i.e., a single

motion picture. *Id.* at 229, 110 S.Ct. 596. Further, because the motion picture distributor in *Freedman* had little incentive to challenge the decision to suppress speech, "the censor's decision to suppress was tantamount to complete suppression of the speech." *Id.* For these two reasons, the censor in *Freedman* was required to go to court to suppress the speech and to justify its decision once in court.

By contrast, under the city ordinance at issue in *FW/PBS*, the city did not exercise discretion by passing judgment on the content of any protected speech. *Id.* In addition, the applicants in *FW/PBS* had every incentive to pursue a license denial through court because "the license is the key to the applicant's obtaining and maintaining a business." *Id.* at 229–30, 110 S.Ct. 596. For these reasons, and because the licensing scheme at issue in *FW/PBS* did not present "the grave 'dangers of a censorship system,'" the *FW/PBS* plurality held that the third procedural protection set forth in *Freedman* was not required. *Id.* at 228, 110 S.Ct. 596 (quoting *Freedman*, 380 U.S. at 58, 85 S.Ct. 734).

The Ninth Circuit has followed the Supreme Court's plurality opinion in *FW/PBS*, holding that the third *Freedman* procedural safeguard is not constitutionally required for a licensing scheme regulating sexually oriented businesses. *See, e.g., Baby Tam & Co. v. City of Las Vegas,* 247 F.3d 1003, 1008 (9th Cir.2001) ("We agree with the lead opinion in *FW/PBS* and conclude that the *Freedman* safeguard placing the burden of instituting proceedings on the state does not apply to licensing schemes such as the one challenged in this case."). More recently, in *Clark,* a case factually similar to the instant case, an adult cabaret owner challenged the constitutionality of the city's licensing requirements for adult cabarets. 259 F.3d at 1003. The Ninth Circuit stated that the plurality opinion in *FW/PBS* "dispensed

with the [third *Freedman*] requirement in the context of business licensing schemes." 259 F.3d at 1005 n. 5. Accordingly, the Ninth Circuit disregarded the third *Freedman* requirement and applied only the first two *Freedman* requirements to the licensing scheme. *Id.*

In the instant case, the Court finds that the licensing scheme in Chapter 7 is like the ones in *FW/PBS* and *Clark,* and unlike the censorship law in *Freedman,* because: (1) as the Court has already found, the Ordinance is content-neutral and the City "does not exercise discretion by passing judgment on the content of any protected speech"; and (2) the business entities subject to license under the Ordinance are not "likely to be deterred from challenging the decision to suppress the speech." *FW/PBS,* 493 U.S. at 229, 110 S.Ct. 596. Thus, the Court finds that the third *Freedman* requirement does not apply to Chapter 7. Further, because the Court finds that Chapter 7 satisfies the first two *Freedman* requirements, the only two requirements applicable to Chapter 7, the Court finds that Chapter 7 does not constitute an impermissible prior restraint. Accordingly, the Court grants the City's motion for summary judgment on this issue.

### C. *Dancer Registration Requirements Are Constitutional*

■ "It is well established that the government may, under its police power, require licensing of various activities involving conduct protected by the [F]irst [A]mendment." *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1059 (9th Cir.1986). "A licensing requirement raises [F]irst [A]mendment concerns when it inhibits the ability or the inclination to engage in the protected expression." *Id.* at 1060 (citing *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). "Further, a licensing requirement must provide 'nar-

row, objective, and definite standards to guide the licensing authority.'" *Id.* (quoting *Shuttlesworth*, 394 U.S. at 150–51, 89 S.Ct. 935).

In its June 19, 2002 Order, this Court found that a triable issue of fact existed as to whether Chapter 7's dancer registration requirements "unreasonably diminish the inclination to seek a license and are therefore sufficiently tailored to the government's interests in preventing the alleged harmful secondary effects associated with adult entertainment." (06/19/02 Order at 39:17–22.) In the instant motion, the City argues that, following the April 2002 amendments to Chapter 7, the Ordinance no longer requires any information beyond that which the Ninth Circuit upheld in *Kev.*

Following the April 2002 amendments, a dancer applicant must submit the following information to the City: (1) a completed application form that includes proof that the applicant is at least 18 years of age; legal name and any other names (including stage names and aliases) used by the applicant; and present home address; (2) a state driver's license or state identification card (if the applicant does not possess either form of identification, then the applicant must provide date of birth, height, weight, and hair and eye color); (3) two color photographs taken within six months of the application; (4) a non-refundable application fee in the amount of $100; and (5) the business name and address where the applicant intends to perform. B.H.M.C. § 4–7.302(b). Prior to the April 2002 amendments, Chapter 7 required, in addition to the requirements set forth above, that an applicant submit (1) fingerprints, (2) a statement that the applicant has not been convicted of specified sections of the California Penal Code, and (3) a statement whether the applicant has been licensed to engage in prostitution in any other jurisdiction. These requirements were still in effect at the time of the Court's June 19, 2002 Order denying the City's motion for summary judgment on this issue.

In its June 19, 2002 Order, the Court found that Chapter 7's then-existing dancer registration requirements exceeded those approved by the Ninth Circuit in *Kev,* "for example, by requiring fingerprints." (06/19/02 Order at 39:12–14.) On this basis, the Court denied the City's motion for summary judgment as to this issue. In *Kev,* the Ninth Circuit upheld an ordinance requiring all erotic dancers to obtain licenses from the County. There, a dancer applying for a license was required to provide: name, address, phone number, birth date, aliases (past and present), and the business name and address where the dancer intended to dance. 793 F.2d at 1059–60. The City now argues that the dancer registration requirements of Chapter 7, as amended in April 2002, are constitutional under *Kev.* As discussed more fully below, the Court finds that the requirements are constitutional and therefore grants the City's motion for summary judgment on this issue.

■■■ When the Court first considered this issue in its June 19, 2002 Order, Chapter 7 required that a dancer applicant submit fingerprints, a statement that the applicant has not been convicted of specified sections of the California Penal Code, and a statement whether the applicant has been licensed to engage in prostitution in any other jurisdiction. The Court found that these three requirements, which were not present in the ordinance at issue in *Kev,* were sufficiently onerous as to raise a triable issue of fact as to whether Chapter 7 inhibited or discouraged dancers from seeking a license. Following the 2002 amendments, these three requirements no longer exist. Chapter 7 now contains only two dancer registration requirements that

exceed those upheld in *Kev.* A dancer applicant must submit: (1) two color photographs; and (2) a state-issued identification card, or, if the applicant does not possess such identification, a description of the applicant's height, weight, and hair and eye color.

The Court finds that these two requirements are not sufficiently onerous as to raise a triable issue of fact as to whether they discourage dancers from seeking a license. Unlike Chapter 7's three previous requirements, including the submission of fingerprints, which results in an applicant's potential entry into a governmental database, the submission of two photographs and a state-issued identification card does not carry the flavor of potential intimidation. Indeed, because an applicant who does not possess a state-issued identification card may instead submit a description of her height, weight, and hair and eye color, the only additional burden imposed on a dancer applicant under Chapter 7, as compared with the ordinance in *Kev*, is the taking of two photographs. The Court finds that this burden is minimal, non-harassing, and does not unreasonably diminish a dancer applicant's inclination to seek a license. After considering Chapter 7's dancer registration requirements in their totality, the Court finds, as a matter of law, that none of the required information unreasonably inhibits the ability or the inclination to seek a license.

The City contends that the information required from entertainers is justified by the City's substantial interest in (1) preventing prostitution and other harmful secondary effects associated with adult entertainment, and (2) preventing the employment of minors in adult entertainment businesses. The Court finds that the dancer registration requirements serve these substantial governmental interests, *see Kev*, 793 F.2d at 1060 ("license requirements serve valid governmental pur-

poses"), and pose only an incidental burden on First Amendment freedoms that is "no greater than is essential to the furtherance" of these interests, *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673.

Further, Chapter 7 expressly states that any information provided by a dancer applicant "is not a public record" and shall not be disclosed by the City other than to City public safety personnel. B.H.M.C. § 4–7.302(d); *see Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson County, Tenn.*, 274 F.3d 377, 395 (6th Cir.2001) ("Metropolitan Nashville cannot publicly release such private information; it can, however, require applicants to provide the identifying information to the licensing board for the limited purpose of ensuring compliance with the Ordinance's regulations, provided Metropolitan Nashville keeps that information under seal.").

Moreover, there is no delay between the dancer's filing of a completed application and the City's granting of a provisional permit. Chapter 7 expressly provides: "Such provisional adult entertainer permit shall entitle the applicant to perform at an adult entertainment business pending the Director's decision on the application. [This] permit shall expire upon the Director's decision on the application." B.H.M.C. § 4–7.304. Thus, Chapter 7 allows a dancer to exercise her First Amendment rights while an application is pending. In *Kev*, the Ninth Circuit declared as unconstitutional a provision of the ordinance that did not give dancer applicants a provisional permit while their applications were pending, absent a sufficiently compelling justification. *Kev*, 793 F.2d at 1060.

In light of the foregoing considerations, the Court finds that Chapter 7's dancer registration requirements do not unreasonably diminish the inclination to seek a li-

cense and are therefore sufficiently narrowly tailored to the City's interests in preventing the alleged harmful secondary effects associated with adult entertainment. Accordingly, the Court grants the City's motion for summary judgment on this issue.

### D. *Restricted Tipping Provisions Are Constitutional*

 Chapter 7 provides that: "No patron shall directly pay or give any gratuity to an entertainer in conjunction with a performance. For purpose of this provision, 'directly pay or give' shall mean the placement of a gratuity by a patron on any portion of an entertainer's person or clothing." B.H.M.C. § 4–7.207(k)(4). Section 4–7.207(k)(5) states: "No entertainer shall solicit any gratuity from a patron." B.H.M.C. § 4–7.207(k)(5).

The plaintiffs first contend that the restricted tipping provisions are unconstitutional as currently written because they violate the First Amendment.[9] The plaintiffs also assert an economic argument that the restricted tipping provisions prevent dancers from making a living from their expressive activities, and make it uneconomical for the Club to operate in the City. The Court addresses each argument in turn.

In *Kev*, the Ninth Circuit examined an ordinance containing language nearly identical to the restricted tipping provisions in Chapter 7. The ordinance provided that: "No patron shall directly pay or give any gratuity to any dancer [and n]o dancer shall solicit any pay or gratuity from any patron." 793 F.2d at 1061, n. 9 (quotations omitted). The alleged purpose of this requirement was to prevent drug and sex transactions. The *Kev* court found that "while the tipping prohibition may deny the patron one means of expressing pleasure with the dancer's performance, sufficient alternative methods of communication exist for the patron to convey the same message. Thus, the regulations are reasonable time, place, and manner restrictions that only slightly burden speech." *Id.* at 1062.

The City contends that the Ordinance does not prohibit tipping but simply prohibits the placement of tips directly on the dancer's person or clothing. As counsel for the City conceded at the hearing on this motion, this means that a patron may place a tip in a jar, for example, and that an entertainer may retrieve the tip from the jar. The Court construes the Ordinance as permitting the placement and retrieval of tips in this manner.

The plaintiffs also challenge § 4–7.207(k)(5), which prohibits an entertainer from "soliciting" any gratuity from "a patron." In *Kev*, the Ninth Circuit upheld an ordinance that prohibited an entertainer from directly soliciting a gratuity from a single patron, not patrons generally. 793 F.2d at 1061–62. The rationale behind *Kev* was the prevention of the secondary effects of drug transactions and prostitution that could be associated with one-on-one solicitation of tips between a dancer

---

9. In the previous motions for summary judgment, the plaintiffs argued that the California Labor Code provides that every gratuity be "the sole property of the employee or employees to whom it was paid, given, or left for." Cal. Labor Code § 351. The plaintiffs contended that entertainers have a right to their gratuities under California state law, and that §§ 4–7.207(k)(4) and (5) are preempted by state law. In its June 19, 2002 Order, the Court found that §§ 4–7.207(k)(4) and (5) are not in conflict with § 351. The Court stated: "The City's Ordinance regulates the manner in which gratuities may be given to entertainers, and prohibits entertainers from soliciting gratuities. It does not authorize employers to receive or interfere with gratuities left for performers, the situation addressed by § 351." (06/19/02 Order at 33 n.25.)

and a patron. Such one-on-one solicitations, in effect, involve a dancer and a patron who are in close proximity to each other, and are therefore more likely than generalized solicitations to give rise to deleterious secondary effects. *Kev* did not prohibit an entertainer from making a generalized solicitation of tips to an audience of customers, because such a prohibition would not have the desired effect of preventing drug transactions and prostitution, and therefore would not be narrowly tailored to serve the government's purposes. This Court construes § 4–7.207(k)(5) as consistent with *Kev*, and therefore finds that it prohibits only the one-on-one solicitation of a gratuity between an entertainer and a single patron.

In light of the foregoing considerations, the Court finds that the City's interests in preventing sex and drug transactions is substantial, and that the restricted tipping provisions of Chapter 7 are narrowly tailored to serve these interests.

With respect to the plaintiffs' economic argument, the City argues that testimony from entertainers establishes that dancers can earn a living at the Club and are not precluded from receiving gratuities. For example, at least one of the Club's dancers has testified that she was able to earn approximately One Thousand Dollars a week (including salary and tips) dancing at the Club. (Mot., Ex. G at 137.) The plaintiffs' argument regarding the negative economic impact of the restricted tipping provisions on the entertainers is misplaced. The Ninth Circuit has held that:

> The test for determining whether an adult business' First Amendment rights are threatened is whether [ ] the government has effectively denied the business

a reasonable opportunity to open and operate within the city or area in question.... The test is whether a business *could* operate under the regulations at issue, not whether a particular business will be able to compete successfully within the market. **In the absence of any absolute bar to the market ... it is irrelevant whether a regulation will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business.**

*Colacurcio v. City of Kent,* 163 F.3d 545, 557 (9th Cir.1998) (quotations & citations omitted; emphasis added).[10] Here, the plaintiffs have provided the Court with no evidence showing that it is impossible for the Club to operate under Chapter 7's restricted tipping provisions. The Club has operated since the Ordinance's adoption in 1998, and yet the plaintiffs have submitted no facts upon which the trier of fact could conclude that the Club's continued operation is due to external funding or some other form of assistance. For example, if the Club has been subsidized, evidence of the subsidy could raise a triable issue of fact as to whether the restricted tipping provisions of Chapter 7 create an absolute bar to the market. Because the plaintiffs have not presented economic evidence sufficient to show that the restricted tipping provisions act, or would act, as an absolute bar to their operation in the market, the Court finds that there is no triable issue of fact as to whether these provisions create an absolute bar to the market.

For the foregoing reasons, the Court finds: (1) that B.H.M.C. §§ 4–7.207(k)(4) & (5), the restricted tipping provisions, are reasonable time, place, and manner restrictions that only slightly burden speech;

---

**10.** The plaintiffs argue that financial impact has a "limited value in determining whether the regulation actually violates the First Amendment," *Clark v. City of Lakewood,* 259 F.3d 996, 1007 (9th Cir.2001), and that *Cola-*

*curcio* no longer reflects the current state of the law in the Ninth Circuit. *Clark,* however, addresses whether economic injury is sufficient to support standing and is therefore distinguishable from the instant matter.

and (2) that the restricted tipping provisions do not act as an absolute bar to the plaintiffs' operation in the market. Therefore, the Court grants the City's motion for summary judgment as to the constitutionality of the restricted tipping provisions.

### E. *Six–Foot Separation Requirement Is Constitutional*

■ Chapter 7 additionally requires that the stage upon which dancers perform be "at least eighteen inches (18″) above the level of the floor; and separated by a distance of at least six feet (6′) from the nearest area occupied by patrons." B.H.M.C. § 4–7.207(k)(1). The Ordinance also requires that no patron be within six feet of the stage while "the stage is occupied by an entertainer" and no patron shall be "permitted within six feet (6″) of any person dancing for any form of consideration." *Id.* § 4–7.207(k)(2).

In its June 19, 2002 Order, this Court found that there was a triable issue of fact as to whether the six-foot separation requirement creates an absolute bar to the Club's ability to function in the market. The Court also found that there was a genuine issue of material fact regarding how the six-foot separation requirement is interpreted and enforced by the City.

The plaintiffs contend that these provisions effectively establish a six-foot "buffer zone." According to the plaintiffs, the buffer zone violates the First and Fourteenth Amendments because: (1) it is more restrictive than necessary to achieve the governmental purpose; (2) it has a negative effect on the economic rights of dancers and therefore acts as an absolute bar to the plaintiffs' operation in the market; and (3) it is unconstitutionally vague. The Court addresses each argument in turn.

The plaintiffs argue that a three-foot buffer zone would be equally effective in stopping bodily contact between dancers and customers. Therefore, the plaintiffs argue, the 6–foot separation requirement is not narrowly tailored. Separation requirements between patrons and dancers, as well as stage elevation requirements, have been uniformly upheld by this circuit. *See Colacurcio,* 163 F.3d 545 (upholding a ten-foot distance requirement); *BSA, Inc. v. King County,* 804 F.2d 1104, 1112 (9th Cir.1986) (six-foot distance requirement upheld as imposing "at most a minimal restriction on First Amendment activity"); *Kev,* 793 F.2d at 1054 (ten-foot distance requirement "did not significantly burden First Amendment rights").

In *Colacurcio,* the Ninth Circuit rejected a challenge to a ten-foot setback provision in erotic dance clubs, although less restrictive regulations, i.e., a four–or six-foot setback, arguably could have achieved the same result. 163 F.3d at 557. The court stated that the question whether the ordinance burdened substantially more expression than necessary was "foreclosed by our earlier decision in *Kev,* which upheld a similar ten-foot distance requirement." *Id.* at 554 (citation omitted). The Ninth Circuit went on to state that "the fine-tuning of the distance requirement" should be left to the legislative body, not the courts. *Id.* Here, because Chapter 7's six-foot separation requirement is a less onerous burden on expression than the ten-foot requirements repeatedly upheld by the Ninth Circuit, the Court finds that the six-foot requirement is narrowly tailored to serve the City's substantial interest in preventing sex transactions and other secondary effects associated with adult entertainment.

With respect to the plaintiffs' economic argument that the six-foot separation requirement acts as an absolute bar to the market, the plaintiffs rely on the deposition testimony of Paul Bern ("Mr.Bern"),

who testified that, in his experience, "buffer zones" had a negative economic impact on the adult businesses with which he was familiar in Washington state. Specifically, Mr. Bern testified that "the separation requirements that we have in the state of Washington have had an effect on our clubs, to the point of turning them from extremely profitable ventures to extremely unprofitable." (Mot., Ex. L at 156.) Mr. Bern did not testify, however, that a six-foot separation requirement prevented clubs from operating in the market. In addition, he testified that, of the six clubs with which he was familiar, none had closed because of a six-foot separation requirement. (*Id.* at 158.)

Moreover, as stated previously, at least one of the Club's dancers has testified that she was able to earn approximately One Thousand Dollars a week (including salary and tips) dancing at the Club. (*Id.*, Ex. G at 137.)

The Court finds that the plaintiffs have not presented economic evidence sufficient to show that the six-foot separation requirement acts, or would act, as an absolute bar to their operation in the market. Applying the standard of impossibility articulated by the Ninth Circuit in *Colacurcio, supra,* the Court finds that the plaintiffs fail to raise a genuine issue of material fact as to whether Chapter 7's six-foot separation requirement acts as an absolute bar to market entry.

The plaintiffs next contend that the so-called "buffer zone" is vague because it does not specify how the six-foot space is to be measured and because there is no

mens rea requirement. A number of courts have upheld such requirements against vagueness challenges. *Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (rejecting a vagueness challenge to eight-foot separation requirement at health care facility entrance on grounds that it is clear what the ordinance as a whole prohibits, despite hyper-technical theories as to what the statute covers, such as whether an outstretched arm constitutes "approaching"); *Tily B., Inc. v. City of Newport Beach,* 69 Cal.App.4th 1, 23, 81 Cal.Rptr.2d 6 (1998) (requirement that the stage be "six feet from the nearest area occupied by patrons" is not vague).

■ Statutes that are vague and that are not subject to reasonable interpretation by common people inherently deny due process and are therefore unconstitutional. *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294. A statute can be impermissibly vague for either of two independent reasons: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and (2) if it authorizes or even encourages arbitrary and discriminatory enforcement. *City of Chicago v. Morales,* 527 U.S. 41, 56–57, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

■ The plaintiffs contend that evidence of the six-foot separation requirement's vagueness is demonstrated by the fact that a Detective Schwab concluded that a possible violation of this Ordinance restriction occurred because there were empty chairs within six feet of the stage.[11] Detective Schwab's relevant deposition

---

11. Detective Schwab testified:

Q: In regard to the buffer zone, would it be your belief that, if a dancer was performing and there was a customer chair within six feet of her, that that would be a violation of the Beverly Hills Municipal Code, or would there actually have to be a customer in that chair?

. . . . .

A: We never actually made that determination in my reports. I stated—and no one was ever cited by us for that violation. But in my reports I would cite the fact that the chairs were closer than the six feet, and I would identify whether someone was seated in them or not. I never made the determination if there was a violation if it was unoccupied.

testimony (*see* footnote 11) establishes that he wrote a report (but issued no citation) in which he merely noted that unoccupied chairs were located within two feet of the stage. Detective Schwab did not determine, however, that the presence of unoccupied chairs within six feet of the stage would constitute a violation. Moreover, it is undisputed that no patron of the Club has ever been cited for being within six feet of the stage, and that neither the Club nor any of its employees has ever been cited based upon an unoccupied chair's location within six feet of the stage. (Schwab Decl. at 29.) The Court, therefore, finds that the question whether the Ordinance *as applied* has been interpreted as prohibiting an unoccupied chair located within six feet of the stage is hypothetical. Accordingly, the Court finds that the as-applied challenge to the City's interpretation and enforcement of the six-foot separation requirement fails to raise a genuine issue of material fact.

The Court now turns to the question whether the six-foot separation requirement *on its face* applies to an empty chair located within six feet of the stage. The Court finds that it does not. The Ordinance states: "No entertainer shall perform except upon a stage that is . . . separated by a distance of at least six feet (6′) of any person dancing for any form of consideration." B.H.M.C. § 4–7.207(k)(1). The Ordinance also requires that no patron be within six feet of the stage "while the stage is occupied by an entertainer" and no patron shall be "permitted within six feet (6″) of any person dancing for any form of consideration." *Id.* § 4–7.207(k)(2). By its terms, the Ordinance's restriction applies only to patrons, not to unoccupied chairs, located within six feet of the stage. The Court finds that this distinction is sufficiently clear and obvious as to provide law enforcement officers, the

(Def's Reply Ex. E, Depo. Schwab at 19–20.)

Club, and the Club's employees and patrons with notice of what conduct is prohibited.

The plaintiffs next assert more broadly that the six-foot buffer zone is vague because it "floats." According to the plaintiffs, because the Ordinance prohibits a patron from being within six feet of any person "dancing for any form of consideration," the buffer zone moves as the dancers move. The Court disagrees. The Ordinance prohibits a patron from being within six feet of the stage "while the stage is occupied by an entertainer." The Court finds that the buffer zone does not "float" because dancers are required to dance on a stage and the requirement states that the stage must be six feet away from the nearest area occupied by patrons during a performance. *Id.* § 4–7.207(k)(1). Given that the Ordinance provides that entertainers may only perform upon a raised stage, the Court finds that the buffer zone does not impermissibly "float."

For the foregoing reasons, the Court finds that the plaintiffs have failed to raise a genuine issue of material fact as to any of their challenges to Chapter 7's six-foot separation requirement. Accordingly, the Court grants the City's motion for summary judgment as to the constitutionality of Chapter 7's six-foot separation requirement.

### F. *Plaintiffs' Regulatory Takings Claim Is Unripe*

The plaintiffs allege that the City's enforcement of the Ordinance "constitutes a taking [of the plaintiffs' property] without just compensation in violation of the Fifth and Fourteenth Amendments." (Compl.¶¶ 80Q, 96V.) In their opposition brief, the plaintiffs argue that "because numerous provisions of Chapter 7 would in fact constitute a regulatory 'tak-

ing' (assuming they are otherwise constitutional), and because no just compensation has been provided by the City ... in this regard, Plaintiffs are entitled to both declaratory and injunctive relief to simply prohibit this uncompensated taking." (Opp. at 20:10–14.) Thus, the plaintiffs have clarified that they seek injunctive and declaratory relief, not damages, under this claim. The City moves the Court for an order finding that the plaintiffs' regulatory takings claim is not ripe for review.

The Supreme Court has held that two requirements must be satisfied in order for a takings claim to be ripe. First, "the government entity charged with implementing the regulations [must have] reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Second, the plaintiffs must have sought "compensation through the procedures provided by the State for obtaining such compensation." *Id.* at 195, 105 S.Ct. 3108. If a claim is unripe, federal courts lack subject matter jurisdiction over the claim and it must be dismissed. *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990). In *Southern Pacific*, the Ninth Circuit stated: "since the Constitution does not prohibit takings, but only takings without just compensation, 'if a State provides an adequate procedure for seeking just compensation,' plaintiffs may not

bring as-applied claims to federal court until they have 'used the procedure and been denied just compensation.'" *Id.* at 503 (quoting *Williamson County*, 473 U.S. at 195, 105 S.Ct. 3108).

Here, with respect to the plaintiffs' takings claim, the plaintiffs have filed no claim, sought no variance, pursued no administrative remedy, and filed no lawsuit at the state level. Thus, the Court finds that the regulatory takings claim is unripe for review. The Court, therefore, grants the City's motion for summary judgment as to the plaintiffs' regulatory takings claim.

### G. *Previous Permit Renewal Provisions*

#### 1. *Background* [12]

On March 29, 1999, the plaintiffs obtained an adult regulatory permit from the City for the operation of the Beverly Club as an adult cabaret.[13] This permit was to last for a period of twenty-four months. B.H.M.C. § 4–7.213. On February 22, 2001, the plaintiffs filed an application for renewal of their permit consisting of an application form and an application fee. On March 2, 2001, the City informed the Club that its renewal application was incomplete, and that required components were missing from the Club's renewal application. (Def's Mot. Ex. F.) These missing elements included fingerprints, applicant's color photo, a letter of justification, a site plan, and a statement of certification.[14]

---

12. This background section is adopted from the June 19, 2002 Order in which the Court granted and denied portions of both the defendant's and the plaintiffs' motions for summary judgment. All citations in this section refer to the moving papers associated with those motions.

13. As a condition attached to the granting of the permit, the City contends that the Club was required to make changes to the interior layout of the Club in order to comply with the

B.H.M.C. (Pls' Mot. Ex. K.) These modifications included: (1) building a raised stage (of at least 18″ high) on which the dancers were to perform; (2) building a manager's station (from which all public portions of the club could be observed; and (3) limiting performances by entertainers to these stages). (*Id.*)

14. The City extended the Club an additional eleven days to submit the missing components. (*Id.*) Ultimately, the Club received a

The City formally denied the Club's application to renew its adult entertainment regulatory permit on April 26, 2001 on the stated grounds that: (1) the application was incomplete; and (2) the interior of the cabaret was never modified and therefore did not comply with the City's Ordinance. (Pls' Mot. Ex. K.) The Club appealed from this decision on May 2, 2001. The City denied the Club's appeal on September 5, 2001. The Club's adult entertainment regulatory permit expired on March 29, 2001.[15] The City enacted revisions to Chapter 7 regarding the permit renewal process on November 8, 2001.

The plaintiffs contend that the old version of the permit renewal process contained in Chapter 7 (superceded on November 8, 2001) was impermissibly vague and therefore unconstitutional.[16] Although these provisions are no longer operative, the plaintiffs contend that they have standing to challenge the provisions because the older version of the renewal provisions served as a basis for the City's denial of the Club's renewal application. The City contends that the plaintiffs lack standing to bring an as-applied challenge to the renewal provisions because the Club never completed the renewal application. The plaintiffs contend that the Club did submit a complete application under the requirements in effect at the time it submitted the application.

The previous version of § 4–7.214 stated in relevant part: "The renewal application shall be submitted together with a non-refundable fee in an amount established by resolution of the City Council. Applications for renewal of an adult entertainment regulatory permit shall be processed in accordance with the procedures governing initial applications." B.H.M.C. § 4–7.214. Pursuant to this section, the plaintiffs argue that a renewal application was complete if the application itself was submitted with the renewal fee, whereas the City contends that the renewal application was not complete unless it had filed, along with it, all the materials required to be submitted for a new business, including a set of fingerprints, photographs, a "letter of justification," and a site plan. See e.g. § 4–7.202(b). Based on the alleged vagueness of the renewal provisions of Chapter 7 at the time of the Club's application, the plaintiffs ask the Court to declare these provisions unconstitutional, and order that the City may not "cancel" or otherwise void the previously issued permit for the failure to properly renew the permit.[17]

On November 21, 2001, the plaintiffs filed a state court administrative mandamus proceeding challenging the City's denial of the renewal application and the hearing officer's denial of their appeal. (Def's Mot., Oblander Decl. ¶ 17.) Because a hearing on the petition for a writ

---

second extension, until March 23, 2001, to submit the completed renewal application.

15. Despite the expiration of the permit, the plaintiffs continue to operate their establishment pursuant to the "stay" provisions of Chapter 7 pending judicial review. 2001 Amendments to § 4–7.502.

16. The parties agree that there is no point in granting an injunction against the old language of § 4–7.214, but the plaintiffs argue that the Court must nonetheless resolve the constitutionality of the previous section because of the plaintiffs' damage claim and be-

cause this previous language was used to deny the renewal application.

17. In November 2001, the City amended the B.H.M.C. to provide that: "The renewal application shall consist of all of the elements prescribed by Section 4–7.202(b) for an initial application except that the renewal applicant's fingerprints shall not be required if the renewal applicant is the permitee...." B.H.M.C. § 4–7.214. The plaintiffs argue that the fact that the City subsequently amended the Ordinance is evidence that the first version was impermissibly vague.

of mandate was to be held on July 24, 2002, the Court, in its June 19, 2002 Order, found that principles of federalism and comity made it appropriate for the Court to abstain from considering or ruling upon this claim at that time. (*See* 06/19/02 Order at 42:16–20.)

### 2. *Discussion*

Since the Court's June 19, 2002 Order, the California Court of Appeal has upheld a superior court's decision to grant the plaintiffs a new administrative hearing. (*See* Opp., Exs. H, I.) The new administrative hearing has not yet been held. According to the City, the hearing is expected to be held sometime in January or February 2004. The decision from that hearing will then be subject to review in the state courts by way of a petition for writ of administrative mandamus. The matter would be subject to the expedited review provisions of California Code of Civil Procedure § 1094.8.

█ Despite the fact that the plaintiffs' application for a renewal of its adult entertainment permit is still the subject of state administrative proceedings, the plaintiffs request that the Court evaluate the previous permit renewal provisions of Chapter 7, and find that those provisions were impermissibly vague and constituted an unconstitutional prior restraint. However, for the same reasons articulated in its June 19, 2002 Order, the Court will abstain from considering or ruling upon this claim at this time. *See San Remo Hotel v. City & County of San Francisco*, 145 F.3d 1095, 1101 (9th Cir.1998) ("If the constitutional question before us might be mooted or substantially narrowed by decision of the state law claims intertwined with the constitutional issues in this case, then our precedents require abstention in order to avoid an unnecessary conflict between state law and the federal Constitution."). Although the plaintiffs request that the

Court rule on this claim "so that Plaintiffs will not have to participate in another impermissible hearing," the plaintiffs provide no legal authority supporting the Court's ability to do so. (Opp. at 14:12–14.) Accordingly, the Court will abstain from ruling upon this claim at this time.

### H. *Plaintiffs' Substantive Due Process Rights Claims*

The plaintiffs allege that Chapter 7 "violates the substantive due process rights of the Plaintiffs and others." (Compl.¶ 80R.) The plaintiffs clarify the scope of this claim in their opposition brief, arguing: (1) that Chapter 7's six-foot separation requirement prevents dancers from locating near patrons; and (2) that Chapter 7's restricted tipping provisions affect the dancers' ability to earn their livelihood. (Opp. at 22:12–16.) These requirements and provisions, according to the plaintiffs, infringe upon the dancers' substantive due process rights. (*Id.*) The City now moves for summary judgment that Chapter 7 does not violate the plaintiffs' substantive due process rights.

█ The Ninth Circuit has held that "[s]ubstantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit." *Armendariz v. Penman*, 75 F.3d 1311, 1325–26 (9th Cir. 1996) (en banc). In *Armendariz*, the Ninth Circuit stated that the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), makes clear that "the scope of substantive due process ... does not extend to circumstances already addressed by other constitutional provisions." *Id.* at 1325.

Here, the plaintiffs' substantive due process claims are encompassed by the First

Amendment. The Court has properly analyzed and ruled upon the plaintiffs' claims regarding the six-foot separation requirement and the restricted tipping provisions under the First Amendment. Thus, the Court finds that the plaintiffs' substantive due process claims are duplicative. The Court, therefore, declines to consider these claims and grants the City's motion for summary judgment that the Ordinance does not violate the plaintiffs' substantive due process rights.

I. *Zoning, Location–Restriction Provision, and Conditional Use Permit Provision Challenges*

The City moves the Court for an order granting summary judgment on the zoning, location-restriction provision, and conditional use permit challenges raised in the plaintiffs' complaint. (Mot. at 18–20.) The Court finds it unnecessary to rule on these challenges because the Court, in its June 19, 2002 Order, ruled against the plaintiffs on each such challenge. There are no triable issues of fact remaining as to any of these challenges. Further, the plaintiffs concede this. (*See* Opp. at 24:4–8.)

J. *The City is Not Liable for Damages*

The City moves the Court for an order finding that the City is not liable for damages. The Court finds, as the plaintiffs concede in their opposition brief, that the question of damages is moot in light of the grounds upon which the plaintiffs sought damages and the Court's previous Orders of June 19, 2002 and September 5, 2002. The plaintiffs state: "Unless and until those rulings (or any of them) are overturned by the Ninth Circuit, there are no valid damage claims remaining in this action." (*See id.* at 24:27–25:2.) Thus, the Court grants the City's motion for summary judgment that the City is not liable for damages.

K. *Attorney's Fees*

The City moves the Court for an order finding that the plaintiffs are not entitled to receive any attorney's fees under 42 U.S.C. § 1988. The Court finds that it would be premature to rule on the issue of attorney's fees. Pursuant to the June 19, 2002 Order, in which the Court found certain provisions of Chapter 7 to be unconstitutional, the plaintiffs arguably are "prevailing parties" within the meaning of 42 U.S.C. § 1988. The Court finds that the issue of attorney's fees should be raised, if at all, pursuant to a regularly-noticed motion for attorney's fees. The plaintiffs have indicated that they will submit such a motion. (Opp. at 25:13–16.) Thus, the Court denies the City's motion as to the issue of attorney's fees.

## IV. Conclusion

Based on the foregoing considerations, the Court grants the City's motion for summary judgment, except as to the issue of attorney's fees. The Court finds that the issue of attorney's fees should be determined pursuant to a regularly-noticed motion for attorney's fees. Further, the Court finds that principles of federalism and comity make it appropriate for the Court to abstain from considering or ruling upon the constitutionality of the prior permit renewal provision, B.H.M.C. § 4–7.214, which is the subject of pending state court administrative proceedings.

IT IS SO ORDERED.